UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| American Dairy Queen Corporation, | ) | Case No: _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT FOR A** |
| vs. | ) | **DECLARATORY JUDGMENT,** |
| | ) | **INJUNCTION, DAMAGES, AND** |
| Guy A. Blume, Blume Investments, LLC, | ) | **OTHER RELIEF** |
| and Royal Professional Solutions, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, American Dairy Queen Corporation ("ADQ"), for its Complaint against Guy Blume ("Blume"), Blume Investments, LLC ("Blume Investments"), and Royal Professional Solutions, LLC ("Royal") (collectively, "Defendants"), alleges as follows:

## NATURE OF THE CASE

1.      This action arose out of a scheme by Blume, a franchisee of ADQ, to extort millions of dollars from ADQ. The extortion has at its root false claims by Blume that ADQ has breached its legal duties to him, claims that are frivolous and have no foundation in fact or in law. Blume's scheme first began in October 2010 and has escalated continuously to this very day. Blume has repeatedly described ADQ representatives, in writing, as "devout cowards," "crooks," "liars," "cheats," thieves, having "zero integrity," "racketeers," "arrogant," and "sneaky snakes." Blume's claims and name-calling have had as their ultimate objective the extortion of huge sums of money from ADQ. Blume has warned ADQ that "I will show your organization no mercy if these issues are not resolved in due time" by ADQ paying money to him. And Blume has invoked God in his mission. Describing himself as "devout," Blume likens himself to David slaying Goliath and claims that "God is on my side." He has warned ADQ to "remember Hell is a hot place!!!" Also implicit in Blume's statements is the threat of violence.

Describing how his "foot is on the gas pedal," Blume claims ADQ has "enraged passion" within him and he is "not letting off." Blume has threatened ADQ that if it does not buy his silence he will take his accusations and name-calling public. Blume has threatened ADQ that he will "continue to do battle with you in the public eye." Blume has lived up to his threats by repeating his accusations to third parties and the media. Blume's acts constitute actionable extortion under common law, as well as common law defamation. They also constitute breaches of the franchise agreements Blume has with ADQ, breaches that destroy the franchisor-franchisee relationship between ADQ and Blume and cannot be cured. In addition, Blume and his alter-ego limited liability companies are in breach of their franchise agreements for failure to provide reports and pay ongoing fees. ADQ seeks as relief for Blume's misconduct a declaration that it is entitled to terminate the franchise agreements with Blume immediately; an injunction restraining Blume from continuing his acts of extortion and defamation; and damages.

## PARTIES

2.     ADQ is a Delaware corporation that maintains its principal place of business at 7505 Metro Boulevard, Edina, Minnesota, and is therefore a citizen of the state of Minnesota.

3.     Blume is a citizen of the state of Iowa.

4.     Blume Investments is a limited liability company established under the laws of the state of Iowa whose members are Guy Blume and Pamela Blume. Guy and Pamela Blume were previously husband and wife, but are now, upon information and belief, divorced. Like Guy Blume, Pamela Blume is a citizen of the state of Iowa. Blume Investments is an alter ego of Blume. The acts of Blume are the acts of Blume Investments and vice versa.

5.      Royal is a limited liability company established under the laws of the state of Iowa whose members are Guy Blume and Pamela Blume, both of whom are citizens of the state of Iowa. Royal is an alter ego of Blume. The acts of Blume are the acts of Royal and vice versa.

## JURISDICTION AND VENUE

6.      This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because complete diversity of citizenship exists between the parties and the value of the damages ADQ seeks to recover and the value of the rights ADQ seeks to protect exceed $75,000, exclusive of interest and costs.

7.      The Court has personal jurisdiction over Blume Investments because Blume Investments consented to personal jurisdiction over it through the franchise agreement governing the operation of a DAIRY QUEEN® restaurant in Johnston, Iowa, as fully described below. In addition, Blume Investments has the minimum contacts with the state of Minnesota necessary to satisfy the due process requirements of the United States Constitution and, therefore, the requirements of the Minnesota long-arm statute.

8.      The Court has personal jurisdiction over Blume because Blume consented to personal jurisdiction over him through the Johnston Franchise Agreement and the Grinnell Franchise Agreement described below. In addition, Blume has the minimum contacts with the state of Minnesota necessary to satisfy the due process requirements of the United States Constitution and, therefore, also satisfy the requirements of the Minnesota long-arm statute.

9.      Personal jurisdiction over Royal is proper because Royal has the minimum contacts with the state of Minnesota necessary to meet the due process requirements of the United States Constitution and, therefore, also satisfy the Minnesota long-arm statute.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because the events giving rise to ADQ's claims occurred, in part, within this District.

## CONDUCT GIVING RISE TO ADQ'S CLAIMS

**A.     The DAIRY QUEEN® Marks and System**

11.     ADQ franchises third parties to operate retail restaurants using the DAIRY QUEEN® trademark and DAIRY QUEEN® franchise system.

12.     The name Dairy Queen was originated by ADQ's predecessor, McCullough's Dairy Queen, in 1940. ADQ and its affiliates are the owners of several federally registered DAIRY QUEEN® trademarks and service marks that are licensed for use in DAIRY QUEEN® restaurants (the "Marks").

13.     The DAIRY QUEEN® Marks have been used continuously by ADQ, its predecessors, and those that ADQ and its predecessors have franchised or licensed to use them. Specifically, the DAIRY QUEEN® Marks have been used in connection with the sale of soft-serve, frozen, and semi-frozen dairy products, frozen and semi-frozen drink products, cooked food products, and other products and services throughout the United States and in several foreign countries.

14.     Currently, over 5,100 DAIRY QUEEN® restaurants exist and operate throughout the United States and abroad. All DAIRY QUEEN® restaurants in the United States operate under franchise or license agreements with ADQ or one of ADQ's subfranchisors called territory operators.

15.     Over the years, ADQ and its related companies have invested millions of dollars in the advertisement and promotion of goods and services sold under the DAIRY QUEEN® Marks. As a result, the DAIRY QUEEN® Marks have become distinctive identifiers of goods

and services provided by DAIRY QUEEN® restaurants and a symbol of consumer goodwill whose value to ADQ is incalculable.

16.     The DAIRY QUEEN® Marks are widely recognized by the general consuming public. Indeed, some DAIRY QUEEN® Marks have been in the marketplace for decades. ADQ enjoys considerable goodwill by reason of its ownership and control of the Marks.

**B.     The Franchise Agreements**

**1.     The Franchise Agreement for Johnston, Iowa**

17.     Blume Investments operated a DAIRY QUEEN® store in Johnston, Iowa, as the assignee of a franchise agreement entered in or about August 1998 by and between ADQ and Lindaman Enterprises, Inc. The agreement was assigned to Blume Investments by Lindaman Enterprises in 2008. As a part of the assignment, Guy Blume executed a guaranty dated September 10, 2008, by which he agreed to "be firmly bound by all of the terms, provisions and the conditions of the Agreement assigned." A copy of the franchise agreement, the assignment, and the guaranty is Exhibit A to this Complaint. These documents are collectively called "the Johnston Franchise Agreement."

18.     On or about November 2, 2010, Blume Investments entered into a business asset purchase agreement with Frauenshuh Hospitality Group of Minnesota, LLC, for the sale of the DAIRY QUEEN® restaurant in Johnston, including a transfer of the underlying franchise agreement. Blume Investments was, at the time, in default under the Johnston Franchise Agreement. According to the terms of the franchise agreement, Blume Investments agreed to pay to ADQ a percentage of its gross retail sales as a royalty and as a sales promotion fee on a monthly basis. Blume Investments further agreed to provide monthly sales reports identifying the gross retail sales from the business and send to ADQ a payment reflecting the royalty and sales

marketing fee owing on the gross retail sales. Blume Investments had failed to send sales reports and failed to pay royalties and sales promotion fees under the Johnston agreement since July 2010. Based on the sales during a comparable period during 2009, ADQ has calculated that as of January 3, 2011, Blume Investments owed it $30,500 in past-due fees. A copy of ADQ's calculation is Exhibit B.

19.     In order to facilitate a sale of the Johnston DAIRY QUEEN® business, ADQ entered into an escrow agreement with Blume and Blume Investments dated December 10, 2010, a copy of which is Exhibit C. In accordance with the escrow agreement, $30,500 of the proceeds from the sale (the estimated amount of past-due fees) were deposited into an escrow account with Commercial Partners Title, LLC, acting as the escrow agent. The parties to the escrow agreement stipulated that a court could order direct disbursement of the funds.

20.     As a part of the sale of the Johnston DAIRY QUEEN® franchise business, Blume Investments promised to pay to ADQ a transfer fee of $3,940.36 for transfer of the franchise agreement. Blume Investments wrote a check to ADQ for the transfer fee. The bank refused to honor the check because the account was closed. A copy of the check as dishonored is Exhibit D.

21.     By reason of the foregoing, Blume Investments is indebted to ADQ for the $30,500.00 held in escrow plus the $3,940.36 for the transfer fee for a total of $34,440.36. Blume is personally indebted to ADQ in the same amount by virtue of the guaranty reproduced in Exhibit A.

## 2.     The Franchise Agreement for Audubon, Iowa

22.     On or about May 1, 1981, ADQ entered into a franchise agreement with Bruce and Marla Lenocker for the operation of a DAIRY QUEEN® restaurant in Audubon, Iowa, a

copy of which is Exhibit E. On or about September 1, 2006, the Lenockers assigned the franchise agreement to Royal. A copy of the assignment is Exhibit F.

23.     According to the terms of the franchise agreement, Royal agreed to pay a percentage of its gross retail sales as a royalty and as a sales promotion fee on a monthly basis. Royal further agreed to provide monthly sales reports identifying the gross retail sales and send to ADQ a payment reflecting the royalty and sales marketing fee owing on the gross retail sales.

24.     Royal has failed to submit monthly sales reports since July 2010. Based on sales during a comparable period during 2009, ADQ has calculated that as of January 3, 2011, Royal owed it $10,187.43 in past-due fees, as set forth in Exhibit G.

25.     Royal is in default under the Audubon Franchise Agreement for the failure to submit monthly sales reports and pay fees on sales. Royal is indebted to ADQ by reason of the default in the amount of $10,187.43. Blume guaranteed payment of this sum to ADQ as reflected in Exhibit F. In addition, Blume agreed in his guaranty to be bound personally by the terms of the Audubon Franchise Agreement. Accordingly, Blume is also in default under the Audubon Franchise Agreement. Blume's defaults under the Johnston Franchise Agreement as identified above are also defaults under the Audubon Franchise Agreement by reason of the cross default provision, Section 9.7 of the Audubon Franchise Agreement, which makes Blume's failure to make timely payment under the Johnston Agreement a default under the Audubon Agreement.

**3.      The Franchise Agreement for Grinnell, Iowa**

26.     On or about August 30, 1966, ADQ entered into a "Territory Agreement" with Steve and Rose Vrban granting to the Vrbans an exclusive license through the operation of DAIRY QUEEN® stores in Poweshiek County, Iowa. A copy of the Territory Agreement is Exhibit H. The Territory Agreement was subsequently assigned to David Kummer. On or about

February 1, 1997, ADQ entered into a Food Service Addendum with Kummer, a copy of which is Exhibit I. A DAIRY QUEEN® restaurant was opened in Grinnell, Iowa, in the county of Poweshiek, Iowa, pursuant to the Territory Agreement and its Food Service Addendum. The Territory Agreement and Food Service Addendum are collectively referred to as "the Grinnell Franchise Agreement." (The Johnston, Audubon, and Grinnell Franchise Agreements are collectively referred to as "the Franchise Agreements.")

27.     On or about July 28, 2009, Kummer transferred the Grinnell Franchise Agreement to Blume through the assignment agreement attached as Exhibit J.

28.     According to the terms of the Grinnell Franchise Agreement, Blume agreed to pay an ongoing royalty of a specified cents per gallon of soft-serve mix sold in the Grinnell restaurant and ongoing royalties and sales promotion fees as a percentage of food sold in the restaurant. The Agreement further required that Blume provide monthly reports to ADQ setting forth the gross sales from the Grinnell store as well as the total number of gallons of mix sold in the store.

29.     Blume has failed to submit monthly reports for December 2009, March-May 2010, September-December 2010, and January 2011. Based on sales during a comparable period in previous years, ADQ has calculated that as of January 2011 Blume owes it $1,630.35 in past-due fees, as set forth in Exhibit K ($1,483.63 for food sales; $146.72 for soft-serve sales).

**C.     Blume's Extortion and Defamation of ADQ**

30.     In or about October 2010, Blume, on his own behalf and on behalf of his alter ego limited liability companies, began a course of conduct that has had as it ultimate objective extorting millions of dollars from ADQ. Blume began falsely accusing ADQ of misconduct under vague theories of "improper estoppels" and "discrimination." He claimed that ADQ had

violated undisclosed legal obligations to him when all ADQ had done was enforce its contractual rights. The claims — and their falsity — are more fully described in paragraph 54 below. Exhibit L-1 through L-49 consists of a series of letters and email communications sent by Blume to ADQ and others illustrating Blume's acts of extortion.

31.     As set forth in Exhibit L-1, Blume sent a letter to ADQ dated October 31, 2010, accusing ADQ of engaging in "personal attacks [that] have hurt me emotionally as well as financially." Blume claimed that ADQ was "slandering me to other operators to be destructive to my business" and "doing improper estoppels calling my ex-wife." He alleged that "DQ has done financial harm and threatened physical harm as well as mental abuse." Blume demanded "$495,000 for the monetary damages based on DQs improper estoppels and discrimination."

32.     ADQ tried to address Blume's accusations, first by contacting Blume's lawyer and then by speaking with Blume directly. On November 19, 2011, ADQ representatives had a conference call with Blume to discuss his supposed complaints. Rather than resolve any issues, the conversation led to more claims by Blume, resulted in an ADQ representative being a particular target of Blume's attacks, and encouraged Blume to be even more venomous than before.

33.     In late November 2010, Blume began accusing ADQ of supposed illegal conduct in failing to provide him with a franchise disclosure document ("FDD") for each of the franchise opportunities he had purchased from third parties. In fact, ADQ had no legal obligation to give Blume an FDD, as discussed below. Blume claimed in an email dated November 22, 2010 (Exhibit L-4), that "I have never received any FDD disclosures from ADQ I have filed several complaints with the Federal trade commission I willl be in touch with [Iowa] senator Grassly's office this week. I have over 15 FTC complaints yet to file against ADQ for improper behavior

according to Federal trade commission laws." DQ believes that Blume likely did file a false claim with the FTC.

34.    Blume continued his efforts to extort money from ADQ into December 2010. On December 8, 2010, Blume sent the following email to ADQ and others (Exhibit L-7):

> It is immoral and unjust what DQ has done and clearly illegal according to the law still they continue to go behind peoples backs and lie, cheat and show no personal responsibility. DQ is it your deal to pick on the sick does this make you feel good. Anything Dq tells you figure the LWF (Lying weisel Factor) = only 20 percent of what they say is the truth. Dq call me I will give you wiring instructions for my account on the money you owe!

35.    On Christmas Eve, December 24, 2010, Blume sent the email communication attached as Exhibit L-6. In it, Blume claimed that "I am putting you on notice that I will show your organization no mercy if these issues are not resolved in due time." He claimed that "my foot is on the gas pedal and it is now to the floor." According to Blume, "you have enraged a passion in me and there is now no letting off!" Further, said Blume, "Warren [Buffett] [the head of Berkshire Hathaway, the owner of International Dairy Queen] would not stand for this and neither will I if this happened to him the purportraitors (ADQ) would be in Jail!!!" Blume insisted that he would "continue to do battle with your organization in the public eye" and stated as follows:

> I have made preliminary contacts with the national press who, as you might imagine, is very eager to get any negative press on Mr. Buffet's organization. In addition, I have started the process of setting up a web site, on-line blog, Facebook, and a Twitter account aimed to bring to light your actions in the social media.

36.    On New Year's Eve, December 31, 2010, Blume sent an email to ADQ repeating his threat to make his false claims and defamatory statements public (Exhibit L-9 through L-10). According to Blume:

John have the e-mail blast ready for next Friday we will e-mail the same message "Friday, Monday, and Wednsday. I want to provide full Disclosure to DQ I don't want to operate like those sneaky snakes who offer know disclosure and have cheated me. I have the Domain set up ready to go.

I want to give you complete Disclosure on What my next steps are: this will be the GBD (Guy Blume Disclosure) because I won't cheat you or act in bad Faith like your organization who has cheated me I would of never got involved if proper Disclosure was given you guys are crooks.

Next steps: I will have my E-mail blasts ready to go to DQ Franchisees it will have a picture of Warren Buffet eating a Blizzard with a caption reading we eat your profits. I will send this to you on Wednsday of Next week. I will be creating this organization it will be called the Dairy Queen Tea Party. I was hoping to get out of your organization but you don't want to act in good faith and do the right thing.

37.     Blume took his threats to new levels in the new year. On January 12, 2011, Blume

sent to ADQ the email attached as Exhibit L-15, in which he stated the following:

fact you did know about Ames (See attached letter you signed), Its amazing improper estoppels happen after my divorce. Dairy queen is a phenomenol Brand with a bunch of crooks and cheats working for them. Do you know whats worse than a thief you know you have to watch a thief but a liar like you lied about not knowing about Ames (Attached your letter) you never know when there telling the truth. If this happened to warren he would not stand for it. Shelly its not for me to judge you or Dairy Queen but someday God will and hopefully Dairy Queen can do the right thing. Right now!!! I have not sent the website to anyone but it is ready and my family and church will be present at the Stockholders meeting in Omaha with are brochures if necessary. (the investors need to be aware of your illegal actions) Bottom line DQ never provided me disclosure!!!! I have talked to my stores and if they see Mark Kleinklein the devout coward they are to contact me I have a few words for him... Also I am calling Bullshit on the fact you did not know anything about Ames as you told my Attorney!!!!

38.     Two days later, on January 14, 2011, Blume sent the email attached as Exhibit L-

16. In it, Blume made veiled threats of physical harm to ADQ representatives. He described a

"new song for you THE TRAINS A COMING JOHNNY CASH." The references to a line from

*Folsom Prison Blues*, a Johnny Cash song containing the lyrics that "I shot a man in Reno, just to

watch him die." Blume likened himself to David slaying Goliath in the email, "David one stone,"

just as he had done on Christmas Eve when he said "David picked up 5 stones used 1 and hit goliath in the forch head in 2 inch opening."

39.     Blume also continued his threat that God would avenge his harm if ADQ did not pay him money. Having described himself as a "man of faith" in his October 31, 2010, letter and having warned ADQ on January 14, 2011, "someday God will" "judge you," Blume on January 16, 2010, described the immortal consequences for ADQ representatives of not acceding to his demands: "Your organization [ADQ] amazes me you guys are crooks!!! there is nothing more to say. Remember Hell is a hot place!!!!" (Exhibit L-17.)

40.     As January progressed, Blume's threats of public disclosure and embarrassment for ADQ became more virulent. He threatened in his January 14, 2011, email, Exhibit L-16, to "enlist any media source and battle for years" unless ADQ gave Blume "the money you stole and damages." On January 24, 2011, Blume threatened to attend the annual Berkshire Hathaway shareholders meeting in Omaha, Nebraska, in a clown suit, as well as defame ADQ before various news agencies. According to Blume in Exhibit L-23:

> Little does he [Warren Buffett] know the magnitude of the clamp he has begun to tighten on the nads of the mom and pop operators. We will see what they [shareholders of Berkshire Hathaway] have to say on April 30th in Omaha when the clown suits come out and the signs start flashing the incriminating facts against them. While I am not too naive to think that one little Guy can communicate the fullness of inept management and illegal practices, but I damned well know that MSNBC, CBS Business Watch, and all the other business magazine will want to know our collective story. Mine is a single-focused witch hunt based on innuendo and rumor all for the sake of bringing me down. When it gets to the national stage, we'll see who listens then. Continue to turn your back on me and the rest of us because one day you'll be forced to look into the light and come to terms with your poor and unjust business practices.

41.     As January progressed, Blume also followed through on his threat to make his claims and statements public. Exhibit L-41 through L-45 identifies Blume's public statements on various blogs beginning on January 13, 2011, and continuing through the date of this Complaint.

42.     On January 28, 2011, Blume's lawyer sent a letter to ADQ's lawyer demanding $12,998,216 to "allow Mr. Blume to exit the Dairy Queen business" and "not to pursue any further action." A copy of the letter is Exhibit M.

43.     Blume's outrageous conduct continued into February 2011. On February 2, 2011, Blume posted a comment on a blog for *Quick Service Magazine* claiming that a "clown suit" had become the official uniform for ADQ employees and warning that over 100 protestors would attend the annual Berkshire Hathaway shareholders meeting in Omaha, Nebraska, to make public the supposed harm to Blume, harm that now equaled $100 million (Exhibit L-34). According to Blume's comment:

> What are they planning to make public? First, they believe the shareholders should be informed of a potentially damaging contractual exposure that could turn into a $100M liability. Second, they want the shareholders to know that they are making massive profits on the backs of the DQ operators who are being held to contractual conditions that were never agreed to nor are they legally binding. Federal law mandates certain communications of facts and conditions under which contracts can be modified. Unfortunately, proper procedures have not been filed all leading to a potentially massive issue.
>
> One would think this all should be enough to get some action. I guess only time will tell . . . .

44.     On February 5, 2011, Blume threatened to send the following to DAIRY QUEEN® franchisees in his "DMA," a DAIRY QUEEN® marketing area. (Exhibit L-35):

**Dear/fellow franchisees DMA Members**

**Please see Articles on QSR the lids about to Blose Dq puts operator on COD say what also pleas review cnbc website for insite on DQ misdeeds**

**I just want to make you aware of clowns running up an down the side walk in front of the Waukee DQ during the DMA meeting please contact Shelly Ocallaghan at 952-830-0200 for an explanation why… Also ask her if ADQ has illegally Ached Money!!! I'm afraid you will get no comment or I plead the 5th…**

**I have the United States as my operating Territory and will only be charging 3 percent franchising fees for any franchisee wanting to open up a Dairy Queen site (please feel free to call Faegre Benson DQ FTC attorney for the validity of this claim)**

**Your friend and fellow franchisee**

**Guy Blume (United States territory operator)**

(Emphasis in original.)

45.     On February 7, 2011, Blume continued his threat to appear at the Waukee DMA meeting. According to a Blume email on that date (Exhibit L-37):

The media will be involved soon I'm not playing you hurt my family you crooks... Here is a couple other Utube charachters I will see you in waukee Dma meeting!!! I don't find this funny but as I have said I will use every legal avenue and media who will listen to broadcast my message.... I am very upset with you I put my faith in a national brand and have been hurt by Dairy Queen/berkshire Hathaway why would you not want to provide disclosure or help someone I just can't understand. I have talked to the National Media and as of right now I am just saying No comment in hopes we can resolve... Where is my money in Escrow? Are you taking the position Your big I am little because its not for me to judge but some day you will have to answer to God. Every WB/ DQ article/ Berkshire/ will have misdeeds listed under comments[.]

46.     Blume made good on his threats. On February 9, 2011, Blume sent a photograph to ADQ that he had apparently taken of himself dressed in a clown suit and also sent the following note: "See you in Waukee [at a DAIRY QUEEN® DMA meeting] be in Omaha in front of berkshire 3hrs later keep you posted (don't worry I a have a tie)." (Exhibit L-38.) Blume also posted an anonymous statement on the *Quick Service Magazine* blog again claiming that a clown suit is the official uniform of all ADQ employees and threatening to "debut" the new uniform at the Waukee, Iowa, DMA meeting. Blume in fact did appear in a clown suit at the DMA meeting and later in a clown suit at the Berkshire Hathaway corporate offices in Omaha, Nebraska. Blume also threatened Berkshire Hathaway that he will return to its offices on Wednesday, February 16, 2010, with the Omaha Channel 6 television station.

14

## COUNT I

## DECLARATORY JUDGMENT AND
## INJUNCTIVE RELIEF ARISING FROM EXTORTION

47.     ADQ realleges all previous paragraphs of this Complaint.

48.     Iowa recognizes a civil cause of action for a violation of its criminal extortion statute. *French v. Foods, Inc.,* 495 N.W.2d 768 (Iowa 1993); *Hall v. Montgomery Ward and Co.,* 252 N.W.2d 421 (Iowa 1977); and *Zohn v. Menard, Inc.,* 598 N.W.2d 323 (Iowa Ct. App. 1999). The Iowa criminal extortion statute is set forth at Chapter 711.4 of the Iowa statutes and provides that:

> A person commits extortion if the person does any of the following with the purpose of obtaining for oneself or another anything of value . . . :

> 1.     Threatens to inflict physical injury on some person, or to commit any public offense.

> 2.     Threatens to accuse another of a public offense.

> 3.     Threatens to expose any person to hatred, contempt, or ridicule.

> 4.     Threatens to harm the credit or business or professional reputation of any person.

49.     By reason of the conduct described above, Blume has committed acts of extortion under the Iowa criminal statute, acts that give rise to a common law cause of action in favor of ADQ. Blume has threatened to inflict physical harm on ADQ representatives; has threatened to accuse ADQ of criminal conduct, a public offense; has threatened to expose ADQ to hatred, contempt, and ridicule; and has threatened to harm the business and professional reputation of ADQ and its representatives — all unless ADQ paid him huge sums of money to buy his silence.

50.     There is an actual controversy between the parties that is sufficiently substantial, immediate, and real to warrant the issuance of a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that Blume has committed acts of extortion.

51.     In addition, ADQ will suffer prejudice to its rights and will continue to incur immediate, irreparable, and substantial harm, unless the Court issues a preliminary and permanent injunction enjoining Blume from his continued acts of extortion. ADQ has made a strong showing that it is likely to succeed on its claims of extortion. Any potential harm to Blume will be outweighed by the harm to ADQ. Moreover, the issuance of an injunction here is in the public interest. Finally, ADQ has no adequate remedy at law to protect its substantial business and property rights.

## COUNT II

## DECLARATORY JUDGMENT AND
## INJUNCTIVE RELIEF ARISING FROM DEFAMATION

52.     ADQ realleges all previous paragraphs of this Complaint.

53.     The statements set forth in Exhibit L communicated to third parties are defamatory in that they tend to injure ADQ's reputation and expose ADQ to public hatred, contempt, ridicule, or degradation. The statements are defamatory *per se* to the extent they contain allegations of serious criminal misbehavior and are injurious to ADQ's trade and business. As such, damages are presumed.

54.     Blume's statements alone are sufficient to warrant the relief requested by ADQ without regard to the truth of the allegations of misconduct that Blume claims are the foundation for his defamation. The allegations of misconduct are, however, false. As it relates to Blume's claim that ADQ breached an obligation to him regarding Ames, Iowa (L-15), ADQ did little more than remind Blume of his duty not to use the DAIRY QUEEN® Marks in his operation of

a non-DAIRY QUEEN® restaurant in Ames, as reflected in a letter dated June 18, 2010, attached as Exhibit N. Regarding Blume's claims that ADQ wrongfully terminated a franchise agreement for the operation of a DAIRY QUEEN® restaurant in Red Oak, Iowa (L-5), Blume was not even the franchisee under the Red Oak agreement, and to the extent Blume was the unauthorized operator of the restaurant, he abandoned the operation prior to termination by ADQ. As it relates to the increase in the royalty payable for store number 15329 (the Audubon, Iowa, restaurant), ADQ had the contractual right to increase the royalty and so informed Blume prior to his purchase of the franchise rights. With respect to Blume's claims of a failure by ADQ to provide him with an FDD (L-3), the applicable law does not require such a disclosure where, as here, ADQ was not involved in the sale of the franchise opportunity, but the sale was by a third party to the franchisee. Finally, regarding the alleged unauthorized withdrawal of funds (L-6), Blume gave permission to ADQ to withdraw the funds, and where ADQ cannot locate written permission, ADQ has offered to put the amount of those withdrawals in escrow pending a ruling by a court on the issue, as reflected in Exhibit O.

55.     There is an actual controversy between the parties that is sufficiently substantial, immediate, and real to warrant the issuance of a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that Blume has committed acts of defamation.

56.     In addition, ADQ will suffer prejudice to its rights and will continue to incur immediate, irreparable, and substantial harm, unless the Court issues a preliminary and permanent injunction enjoining Blume from his continued defamation. ADQ has made a strong showing that it is likely to succeed on its claims of defamation. Any potential harm to the Defendants will be outweighed by the harm to ADQ. Moreover, the issuance of an injunction

here is in the public interest. Finally, ADQ has no adequate remedy at law to protect its substantial business and property rights.

## COUNT III

### DECLARATORY RELIEF ARISING FROM BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

57.     ADQ realleges all previous paragraphs of this Complaint.

58.     Implied in the Franchise Agreements is a covenant of good faith and fair dealing that emphasizes faithfulness by each party to the agreed common purpose of the Agreements and consistency with the justified expectations of the other party. Blume, alone and on behalf of his alter ego limited liability companies, has breached the implied covenant of good faith and fair dealing. Among other things, Blume's conduct has precluded ADQ from exercising its rights under the Franchise Agreements to inspect Blume's restaurants for fear of physical harm to its employees. It has precluded ADQ from having the dialogue that is a part of the normal franchisor-franchisee relationship for fear that any contact will only further inflame Blume and increase his efforts to extort money from ADQ. ADQ is unable to exercise its contractual right to assure Blume's compliance with ADQ's system standards for fear of retaliation. Blume's actions have also damaged the goodwill associated with the DAIRY QUEEN® Marks.

59.     There is an actual controversy between the parties whether Blume (and therefore his limited liability companies) has breached the implied covenant of good faith and fair dealing. This controversy is substantial and between parties having adverse legal interests of sufficiency, immediacy, and reality to warrant the issuance of a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that Blume has breached the covenant.

## COUNT IV

## DECLARATORY JUDGMENT THAT ADQ HAS THE RIGHT
## TO TERMINATE THE FRANCHISE AGREEMENTS IMMEDIATELY

60.    ADQ realleges all previous paragraphs of its Complaint.

61.    ADQ believes and alleges that Defendants' conduct goes to the essence of the parties' relationship and substantially defeats the purpose of the relationship. ADQ believes and alleges that it may therefore terminate the Franchise Agreements immediately, notwithstanding the existence of any notice and cure provision in the Agreements or under applicable law. *See Olin v. Central Industries, Inc.*, 576 F.2d 642 (5th Cir. 1978); *LJL Transportation, Inc. v. Pilot Air Freight Corp.,* 962 A.2d 639 (Pa. 2009); *Southland Corp. v. Mir*, 748 F. Supp. 969 (E.D.N.Y. 1990) (franchisees' deliberate understatement of volume of reported sales constituted a breach that went directly to the essence of the contract such that termination was proper without resort to notice and cure provisions of the franchise agreement); *In re Best Film and Video Corp.*, 46 B.R. 861 (Bankr. E.D.N.Y. 1985) (conduct of franchisee in unauthorized editing and showing of a film was so egregious as to constitute a vital breach of the agreement justifying immediate termination despite notice and cure provisions); *L.K. Comstock & Co., Inc. v. United Engineers & Constructors Inc.*, 880 F.2d 219 (9th Cir. 1989) (because subcontractor was so deficient in meeting performance requirements, there was no reasonable likelihood he could ever cure his breach thus vitiating any notice and cure obligation on the part of the contractor). *See also* Jason J. Stover, *No Cure, No Problem: State Franchise Laws and Termination for Incurable Defaults*, 23 Franchise L.J. 217 (2004).

62.    There is an actual controversy between the parties whether ADQ has the right to terminate the Franchise Agreements immediately by reason of Blume's conduct. This controversy is substantial and between parties having adverse legal interests of sufficiency,

immediacy, and reality to warrant the issuance of a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that ADQ has such a right.

## COUNT V

### INJUNCTION ENFORCING POST-TERM OBLIGATIONS

63.     ADQ realleges all previous paragraphs of this Complaint.

64.     The Franchise Agreements contain various post-term obligations on the part of Defendants.

65.     ADQ will suffer prejudice to its rights and will continue to incur immediate, irreparable, and substantial harm, unless the Court issues a preliminary and permanent injunction enforcing Defendants' post-term obligations. ADQ has made a strong showing that it is likely to succeed on its claims of a right to terminate the Franchise Agreements immediately. Any potential harm to Blume will be outweighed by the harm to ADQ. Moreover, the issuance of an injunction here is in the public interest. Finally, ADQ has no adequate remedy at law to protect its substantial business and property rights.

## COUNT VI

### DAMAGES

66.     ADQ realleges all previous paragraphs of this Complaint.

67.     ADQ is entitled to damages for the unpaid fees and other charges described above, as well as damages attributable to Defendants' misconduct described above.

### PRAYER FOR RELIEF

**WHEREFORE,** ADQ prays this Court for:

1.     A declaratory judgment that Defendants have committed common law extortion, committed the tort of defamation, and breached the Franchise Agreements.

2.      A declarative judgment that ADQ is entitled to terminate the Franchise Agreements immediately.

3.      A preliminary and permanent injunction enjoining Defendants from their acts of extortion and defamation.

4.      A preliminary and permanent injunction enforcing Defendants' post-term obligations.

5.      An order directing the payment of all funds held in escrow to ADQ.

6.      An award of damages.

7.      An award of attorneys' fees incurred, together with court costs and expenses of suit.

8.      An award of such further relief as the Court deems just and proper.

Dated: February 11, 2011                  FAEGRE & BENSON LLP


                                          By:      s/William L. Killion
                                          William L. Killion, MN Atty. #55700
                                          2200 Wells Fargo Center
                                          90 South Seventh Street
                                          Minneapolis, Minnesota 55402
                                          Phone: (612) 766-7000
                                          Fax: (612) 766-1600
                                          Email: wkillion@faegre.com

fb.us.6337042.04